UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROBERT SPEARS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-cv-00356-SEB-MJD |
| | ) |
| WEXFORD HEALTH, et al. | ) |
| | ) |
| Defendants. | ) |

**Order Granting Defendants' Motion for Summary Judgment,
Denying Plaintiff's Motion for Oral Argument,
and Directing Entry of Final Judgment**

Plaintiff Robert Spears has been incarcerated within the Indiana Department of Correction ("IDOC") since 2016. This action concerns the level of medical care Mr. Spears received while he was incarcerated at Pendleton Correctional Facility ("PCF"). Mr. Spears alleges that Dr. Talbot and Nurse Practitioner Murage were deliberately indifferent towards his serious medical conditions in violation of the Eighth Amendment. He also alleges that his Eighth Amendment rights were violated by a policy or practice of Wexford.[1]

## I. Defendants' Motion for Summary Judgment

The defendants seek resolution of the claims alleged against them through summary judgment. They argue that Mr. Spears's constitutional rights were not violated. They also contend that Mr. Spears cannot show that a policy or practice of Wexford caused the alleged harm. Mr. Spears responded in opposition to the motion for summary judgment, and the defendants have

---

[1] Mr. Spears also asserted an Eighth Amendment claim against Dr. Charles Howe. *See* dkt. 1; dkt. 8 at 3. However, this Court previously granted Dr. Howe's motion for summary judgment. *See* dkt. 96. Unless otherwise noted, all references to "defendants" refer to Nurse Practitioner Murage, Dr. Talbot, and Wexford.

replied. For the reasons explained below, the defendants are entitled to judgment as a matter of law.

**A. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).

To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Not every factual dispute between the parties will prevent summary judgment, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Finally, although *pro se* filings are construed liberally, *pro se* litigants such as Mr. Spears are not exempt from procedural rules. *See Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (noting that "*pro se* litigants are not excused from compliance with procedural rules"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced").

### B. Statement of Facts

In his responses to the motion for summary judgment, the plaintiff identifies several facts that he contends are disputed. *See* dkt. 112; dkt. 113. The Court will highlight the disputed facts in this section and analyze the impact of those disputes in its analysis of the defendants' motion for summary judgment.

Mr. Spears was transferred to PCF in August 2017. Dkt. 102-1 at ¶ 6. Nurse Practitioner Murage saw Mr. Spears for his back condition on August 30, 2017. Dkt. 102-17. Mr. Spears informed Nurse Practitioner Murage that he had seen an orthopedist who recommended an injection in his back. *Id.* He also stated that the pain had increased and was affecting his ability to function. *Id.* In response, Nurse Practitioner Murage increased Mr. Spears's prescription for Neurontin pending review of his medical records. *Id.*

Nurse Practitioner Murage saw Mr. Spears again on September 29, 2017. Dkt. 102-18. At this chronic care visit, they discussed both his back pain and the length of his toenails. *Id.* Mr.

Spears reported that his symptoms were not controlled, and Nurse Practitioner Murage noted that Mr. Spears was awaiting a selective nerve root injection ("SNRI") that had been approved. *Id.* With respect to his toenails, Nurse Practitioner Murage concluded they were well-trimmed and Mr. Spears did not need a health care provider to trim them. *Id.*

Nurse Practitioner Murage met with Mr. Spears for a third time on October 18, 2017. Dkt. 102-19. At this visit, Mr. Spears complained of a burning sensation in his right knee and reported that it kept popping and giving out. *Id.* Nurse Practitioner Murage referred Mr. Spears for x-rays. *Id.*

On November 22, 2017, Mr. Spears saw Dr. Talbot for the first time. Dkt. 102-2. Mr. Spears complained that the SNRI he had recently received was placed in the wrong spot and provided no relief. *Id.* Dr. Talbot reviewed Mr. Spears's medical records and noted that an EMG performed in April 2016 showed no evidence of active radiculopathy and that Mr. Spears was denied pain control by Wishard Hospital in August 2016 as not medically necessary. *Id.* Dr. Talbot evaluated Mr. Spears's activities of daily living and saw no functional limitations. *Id.* Thus, Dr. Talbot recommended placing Mr. Spears in in the chronic care clinic. [2] *Id.*

Dr. Talbot saw Mr. Spears two weeks later, on December 6, 2017. Dkt. 102-3. Mr. Spears again complained that the SNRI was not placed in the correct area, and Dr. Talbot told him the reports were not available yet. *Id.* Dr. Talbot noted that Mr. Spears's functional limitations were not clear and that his activities of daily living appeared normal. *Id.* The medical records indicate that Dr. Talbot recommended that Mr. Spears have another appointment with a neurologist. *Id.*

---

[2] In his affidavit, Dr. Talbot states that he noted in the medical records that Mr. Spears's prescription for Neurontin be re-evaluated when the current prescription expired because there was no neuropathy found in the EMG. Dkt. 102-1 at ¶ 7. The Court could discern no such note in the medical records. Dkt. 102-2. Additionally, Dr. Talbot extended Mr. Spears's prescription for Neurontin for an additional ninety days on December 20, 2017. Dkt. 113-1 at 52.

Mr. Spears has submitted an unverified statement about the appointment on December 6, 2017. Dkt. 113-1 at 30. He claims that he informed Dr. Talbot that he could not trim his toenails and that they were starting to hurt. *Id.* Dr. Talbot asked Mr. Spears to remove his shoe, and then he commented that Mr. Spears could not remove his shoe and laughed. *Id.*

On December 20, 2017, Dr. Talbot evaluated Mr. Spears for the third time. Dkt. 102-4. Mr. Spears again claimed the SNRI had been placed in the wrong area, and Dr. Talbot reviewed Mr. Spears's medical history with him. *Id.* Dr. Talbot concluded that the pain might be coming from the fifth lumbar vertebrae or the sacroiliac joint and recommended a re-evaluation by the pain specialist/neurologist. *Id.* According to Dr. Talbot's notes, Mr. Spears did not want a follow-up appointment. *Id.* The medical records reflect that Dr. Talbot extended Mr. Spears' prescription for Neurontin for an additional ninety days at this appointment. Dkt. 113-1 at 52.

Also at this appointment, Mr. Spears complained that his right toenails needed clipped. Dkt. 102-4. After examining them, Dr. Talbot determined the toenails were "not in any definite need for clipping." *Id.* He recognized that the toenails may need to be clipped in the future but did not think it was necessary that day. *Id.* Dr. Talbot's notes also reflect that the appointment ended abruptly because Mr. Spears wanted an officer to be present. *Id.*

Mr. Spears has submitted an unverified statement stating that there was a confrontation between himself and Dr. Talbot at this appointment. Dkt. 113-1 at 29. Mr. Spears wanted another individual to witness the appointment, and Dr. Talbot ended the appointment because it was to be confidential. *Id.* Mr. Spears asserts that Dr. Talbot originally agreed to have someone trim Mr. Spears's toenails but did not do so after the confrontation with Mr. Spears. *Id.*

On December 22, 2017, a nurse noted that the toenails on Mr. Spears's right foot "were long and starting to curl to the point where he couldn't wear his shoes." Dkt. 113-1 at 26. The

nurse also recorded that Mr. Spears used his left foot to remove the sock on his right foot because he could not bend over due to the pain in his back. *Id.*; *see also* dkt. 113-1 at 28 (unverified statement signed by correctional officer stating Mr. Spears's toenails needed trimmed on December 22, 2017).

Mr. Spears saw Nurse Practitioner Murage on January 10, 2018. Dkt. 102-20. He complained that he was having trouble bending, walking, and moving. *Id.* He reported the pain was worsening despite the SNRI, that pain was running down his leg to his foot, and that his back was locking up. *Id.* He also stated that his pain affected his activities of daily living. *Id.*

Nurse Practitioner Murage reviewed Mr. Spears's medical records and examined him. She noted that Mr. Spears could walk with an antalgic gait with a cane, that he got onto the examination table with no assistance, and that he had a limited range of motion. *Id.* She noted that a request for a follow-up with the pain specialist was pending and recommended continuing the current pain management. *Id.*

At this appointment, Mr. Spears also stated that he could not lift his right leg to trim his toenails. *Id.* Nurse Practitioner Murage saw that he had overgrown toenails on his right foot and said she would have the nurses schedule him for toenail trimming. *Id.*

Dr. Talbot met with Mr. Spears again on January 24, 2018. Dkt. 102-5. Mr. Spears requested Naproxen to help with his pain. *Id.* Dr. Talbot agreed to write a prescription for Naproxen, an NSAID used to treat certain types of pain, and advised Mr. Spears that the prescription for Neurontin would be discontinued because it was being diverted and abused at a high rate at PCF. *Id.*; *see also* dkt. 102-1 at ¶ 15. Dr. Talbot also noted that the request for a follow-up appointment with the pain specialist/neurologist had been denied after collegial review. Dkt.

102-5. The revised plan was to monitor his functional abilities and activities of daily living onsite. *Id.*

On February 1, 2018, Mr. Spears saw a nurse and complained of back pain. Dkt. 113-1 at 23-25. He reported that he could not move from his bed, that his back was locked up, that he could not go to chow, and that he had to be carried to the bathroom. *Id.* He also stated that his medication had been taken away. *Id.* The nurse noted that he arrived by wheelchair and that it was difficult for Mr. Spears to walk. *Id.* The nurse referred Mr. Spears for a doctor visit, noting that his condition was not responding to protocol. *Id.*

When Mr. Spears saw Dr. Talbot on February 7, 2018, and again complained of pain, Dr. Talbot prescribed Trileptal and Mobic and discontinued the prescription for Naproxen. Dkt. 102-6. Custody staff reported that Mr. Spears had trouble getting out of bed at least two or three times in the last week, and Dr. Talbot noted that he would "revisit" the requested referral to the pain specialist/neurologist. *Id.*; *see also* dkt. 113-1 at 61-63.

At the next appointment three weeks later, Dr. Talbot reported that there was no correlation between Mr. Spears's sensory claims and the results of examinations. Dkt. 102-7. However, Mr. Spears was approved for another appointment with a pain specialist/neurologist. *Id.* Dr. Talbot also recommended on site physical therapy and opined that should have preceded the first SNRI. *Id.*

Mr. Spears had his first physical therapy appointment on March 8, 2018. Dkt. 102-8. The physical therapist evaluated Mr. Spears and concluded that he could not tolerate the exercises. *Id.* She recommended that he have a follow-up physical therapy appointment after his consultation with a pain specialist but recognized that physical therapy might not be beneficial because it had failed twice in the past. *Id.*

Mr. Spears saw a nurse on March 13, 2018, to have his toenails trimmed. Dkt. 113-1 at 27. The record from this visit states only that Mr. Spears had "long hard nails" that needed trimmed. *Id.* He had another visit with a nurse to trim his toenails on March 16, 2018. Dkt. 113-1 at 32-33.

Mr. Spears received a second SNRI on March 19, 2018, and had a follow-up appointment with Dr. Talbot on March 21, 2018. Dkt. 102-9. He stated that the three injections he received provided only brief, partial relief. *Id.* He also claimed that the Trileptal was not helping control the pain. *Id.* Dr. Talbot reviewed Mr. Spears's medical records and decided to discontinue the Trileptal, prescribe the pain medication Pamelor, and confer with the pain specialist/neurologist about the recent SNRI. *Id.*

At his follow-up physical therapy appointment, Mr. Spears reported no benefit from the second SNRI and stated he was doing the exercises daily but could not tolerate them well. Dkt. 102-10. The physical therapist gave him new exercises and opined that injections in his sacroiliac joint may help improve his hip movement. *Id.*

Mr. Spears received an injection in his right sacroiliac joint on April 18, 2018, by the pain specialist/neurologist. Dkt. 102-11. It "failed." *Id.*

At the follow-up appointment with Dr. Talbot on April 25, 2018, Mr. Spears requested an MRI of his back and a medical mattress. *Id.* Dr. Talbot noted that Mr. Spears could walk with a cane and could perform his activities of daily living without assistance. *Id.* In response to Mr. Spears's complaints, Dr. Talbot continued the prescription for Mobic; submitted a request for an evaluation by an off-site, non-pain specialist, neurologist; and ordered another x-ray of Mr. Spears's right hip and right knee. *Id.*

Dr. Talbot initiated another appointment with Mr. Spears on May 2, 2018. Dkt. 102-12. Dr. Talbot highlighted that an issue with the evaluation and treatment of Mr. Spears's complaints

8

was his ability to dress himself and his lack of "clear functional limitations" despite his complaints of pain. *Id.* Consequently, Dr. Talbot's earlier referral for additional x-rays was denied after collegial review, and the revised treatment plan was to reassess Mr. Spears again in six to eight weeks. *Id.* Dr. Talbot also noted that there was no indication for Naproxen as Mr. Spears had a prescription for Mobic. *Id.*

Mr. Spears had another physical therapy appointment on May 3, 2018. Dkt. 102-13. The physical therapist reviewed his home exercise plan, taught him a few new flexibility exercises, and recommended a follow-up appointment in three to four weeks. *Id.* The physical therapist noted "terrible tightness in the right hip and thigh muscles." *Id.*

At Mr. Spears's chronic care visit on May 9, 2018, Dr. Talbot diagnosed Mr. Spears with severe progressive right hip degenerative joint disease. Dkt. 102-14. Although he denied Mr. Spears's request for a medical mattress, Dr. Talbot wrote an order for Mr. Spears to have a wedge pillow, a cane for walking shorter distances, and a wheelchair for longer distances. *Id.*; *see also* dkt. 113-1 at 46. Dr. Talbot also made sure the prescription for Mobic was keep-on-person and wrote an order for nurses to assist Mr. Spears with trimming his toenails. Dkt. 102-14. Dr. Talbot also considered submitting a request for Mr. Spears to be evaluated by an orthopedist. *Id.*

Mr. Spears had an appointment with Dr. Talbot again on May 30, 2018, and complained that the Pamelor was not working. Dkt. 102-15. Although Dr. Talbot stated that Mr. Spears appeared improved clinically because he had a less defined antalgic gait and was almost carrying his cane, Dr. Talbot increased the dosage of the Pamelor prescription. *Id.*; *see also* dkt. 102-1 at ¶ 27.

## C. Analysis

Mr. Spears asserts three claims in his complaint: 1) Dr. Talbot exhibited deliberate indifference to Mr. Spears's serious medical needs by inadequately treating his back pain and toenails; 2) Nurse Practitioner Murage was deliberately indifferent to Mr. Spears's back pain and toenail growth; and 3) Wexford has an unconstitutional policy or practice of improperly treating inmates.

### 1. Deliberate Indifference

Because Mr. Spears was incarcerated during all relevant periods, his medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc).

For purposes of summary judgment, the defendants concede that Mr. Spears's back pain, and the resulting overgrown toenails, were objectively serious medical conditions. Thus, only the second element is at issue for Mr. Spears's claims against Dr. Talbot and Nurse Practitioner Murage—whether they were deliberately indifferent to those serious medical conditions.

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety." *Whiting*, 839 F.3d at 662 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This is a subjective test: "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.*; *Petties*, 836 F.3d at 728.

"When a prison medical professional is accused of providing *inadequate* treatment (in contrast to *no* treatment), evaluating the subjective state-of-mind element can be difficult." *Whiting*, 839 F.3d at 662. This is so because "[a] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)); *see also Pyles*, 771 F.3d at 409.

This Court "will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles*, 711 F.3d at 409; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). "It's clear that evidence of medical negligence is not enough to prove deliberate indifference. . . . So without more, a mistake in professional judgment cannot be deliberate indifference." *Whiting*, 839 F.3d at 662 (collecting cases).

The admissible evidence before the Court shows that, rather than disregarding Mr. Spears's back pain and overgrown toenails, Dr. Talbot and Nurse Practitioner Murage continued to evaluate Mr. Spears and attempted multiple treatment options to alleviate the reported back pain and remedy the overgrown toenails. Mr. Spears was even repeatedly referred to a pain specialist/neurologist for multiple injections in an attempt to treat his reported back pain.

a. Nurse Practitioner Murage

Nurse Practitioner Murage evaluated Mr. Spears a total of four times. *See* dkt. 102-16 at ¶ 12. As detailed above, Nurse Practitioner Murage responded to Mr. Spears's complaints of back pain by evaluating his condition, reviewing his medical records, and—on one occasion—increasing his prescription for Neurontin in an attempt to alleviate the pain he was experiencing while awaiting the approved SNRI. When he reported knee pain at one of his visits, Nurse Practitioner Murage evaluated him and ordered x-rays to assist with diagnosing the cause.

In response to Mr. Spears's complaints about the length of his toenails, Nurse Practitioner Murage examined them and made a recommendation, depending on the need for trimming. *See* dkt. 102-18 (no trimming needed); dkt. 102-20 (referring to nurses to schedule nail trimming). Although Mr. Spears contends that Nurse Practitioner Murage did not actually submit a referral for nail trimming, *see* dkt. 112 at 4, his unsworn statements are not verified evidence and thus cannot be considered by this Court. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) ("To be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'" (quoting *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010)).

Mr. Spears has not presented "evidence from which a reasonable jury could infer [Nurse Practitioner Murage] knew [s]he was providing deficient treatment." *Petties*, 836 F.3d at 726. Thus, she is entitled to summary judgment on Mr. Spears's Eighth Amendment claim concerning the treatment of his back pain and overgrown toenails.

b. Dr. Talbot

Dr. Talbot similarly responded to and continued to evaluate and treat Mr. Spears's complaints of back pain and overgrown toenails. Dr. Talbot examined Mr. Spears for the first time

after Mr. Spears had received the first SNRI. As detailed above, over the course of his treatment of Mr. Spears, Dr. Talbot repeatedly reviewed Mr. Spears's medical records, evaluated his ability to complete his activities of daily living and his functional limitations, prescribed multiple different pain medications, and recommended physical therapy to treat Mr. Spears's symptoms.

In addition to continuously evaluating Mr. Spears, Dr. Talbot submitted multiple referrals for Mr. Spears to see a pain specialist/neurologist and, on one occasion, renewed the request after it was denied when Mr. Spears continued to complain of pain. Mr. Spears does not dispute that he received two SNRIs and one injection in his sacroiliac joint to help alleviate his pain. On another occasion, Dr. Talbot submitted a referral for Mr. Spears to see a neurologist who was not a pain specialist because it appeared the injections were not resolving the issue.

With respect to the length of Mr. Spears's toenails, much like Nurse Practitioner Murage, Dr. Talbot examined Mr. Spears's toenails and made recommendations based on their current state. *Compare* dkt. 102-14 (recommending nurse trim Mr. Spears's toenails) *with* dkt. 102-12 (informing Mr. Spears that he can trim toenails with commissary shears) *and* dkt. 102-4 (noting toenails do not need trimming). Thus, Dr. Talbot was not deliberately indifferent to Mr. Spears's overgrown toenails.

Mr. Spears has submitted a report from a nurse, dated two days after an appointment wherein Dr. Talbot concluded that Mr. Spears's toenails did not need to be trimmed, stating that Mr. Spears's toenails were long and curled under and needed trimming. Dkt. 113-1 at 26. This report does not defeat Dr. Talbot's motion for summary judgment, however, because it does not directly contradict Dr. Talbot's conclusion that Mr. Spears's toenails did not need to be trimmed on December 20, 2017. It merely reflects what Dr. Talbot noted in his evaluation—Mr. Spears's

toenails did not need to be trimmed that day but may need to be trimmed in the future.[3] *See* dkt. 102-4.

Additionally, although Mr. Spears claims that Dr. Talbot originally concluded that Mr. Spears's toenails needed to be trimmed and changed that recommendation after a confrontation with Mr. Spears, *see* dkt. 113-1 at 29, he has not provided admissible evidence in support of this argument. The Court "may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Mr. Spears's unverified assertions are not sufficient to overcome the motion for summary judgment.

Mr. Spears attempts to avoid summary judgment by disputing whether he was able to complete activities of daily living and whether he had any functional limitations, as reported by Dr. Talbot. *See* dkt. 112 at 5, 9-10, 13-14, 15. Even assuming Dr. Talbot's assessments of Mr. Spears's ability to complete activities of daily living and functional limitations were incorrect, Dr. Talbot is still entitled to summary judgment. The record before the Court establishes that Dr. Talbot continued to evaluate and treat Mr. Spears. He prescribed five different pain medications, referred Mr. Spears to an outside pain specialist/neurologist for multiple injections to help with the pain, and referred Mr. Spears for physical therapy. Dr. Talbot was actively treating Mr. Spears's back pain, notwithstanding his evaluation of Mr. Spears's functional limitations and ability to complete activities of daily living.

Mr. Spears also argues that Dr. Talbot is not entitled to summary judgment because he discontinued Mr. Spears's prescriptions for pain medicine, especially Neurontin, for no valid

---

[3] Mr. Spears also submitted two nurse reports, dated March 13, 2018, and March 16, 2018, in support of his argument that Dr. Talbot was deliberately indifferent to Mr. Spears's overgrown toenails. Dkt. 113-1 at 27, 32-33. These reports, however, support the conclusion that Mr. Spears was receiving the care he requested. Specifically, the nurses were assisting him with trimming his toenails when needed.

reason. Dkt. 112 at 7-9, 15. The evidence, however, refutes Mr. Spears's claims. Although Mr. Spears claims that Dr. Talbot took away the Neurontin prescription because he was upset with Mr. Spears, Dr. Talbot is nonetheless entitled to summary judgment because he replaced the Neurontin prescription with a prescription for Naproxen, another type of pain medication. *See* dkt. 102-5; dkt. 102-2 at ¶ 11. Additionally, Mr. Spears continued to complain of back pain even when taking Neurontin. *See* dkt. 102-2; dkt. 102-3; dkt. 102-4. The Court will defer to Dr. Talbot's decision to discontinue a highly trafficked pain medication when it appears that medication is not working. *See Sain*, 512 F.3d at 894-95 (noting medical professionals are entitled to deference unless even a minimally competent medical professional would have acted differently).

The same is true with respect to Mr. Spears's claims concerning the other pain medications. When Mr. Spears reported that the Naproxen was not working, Dr. Talbot prescribed Mobic and Trileptal. Dkt. 102-6. When that medicine was not effective, Dr. Talbot discontinued the Trileptal and prescribed Pamelor. Dkt. 102-9. When Mr. Spears stated that he had a burning sensation in his feet, Dr. Talbot prescribed capsaicin. Dkt. 102-11. After more reports of pain, Dr. Talbot increased the dosage of Pamelor. Dkt. 102-15. At the same time, Dr. Talbot was referring Mr. Spears to a pain specialist/neurologist for injections to treat the pain.

The record demonstrates that Dr. Talbot actively treated Mr. Spears's back pain and overgrown toenails. Dr. Talbot is entitled to summary judgment on Mr. Spears's Eighth Amendment claim.

2. *Policy or Practice*

Mr. Spears next alleges that Wexford violated the Eighth Amendment by establishing a policy or practice of improperly diagnosing and treating prisoners. Wexford is "treated the same as a municipality for liability purposes under § 1983." *See Minix v. Canarecci*, 597 F.3d 824, 832

(7th Cir. 2010) (holding that a corporation that contracted with a jail to provide health services is "treated the same as municipalities for liability purposes in a § 1983 action"). Thus, to hold a private corporation liable under § 1983, a plaintiff must establish that the alleged "constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). If a plaintiff provides "no evidence of an unconstitutional policy or custom of Wexford itself, [] precedents doom his claim against the corporation." *Id.*

Although Mr. Spears alleges that Wexford has a policy or practice of improperly diagnosing and treating prisoners' medical conditions, he provides no evidence in support of his allegation. The two cases he cites as examples, *see* dkt. 112 at 31, did not have a finding of a constitutional violation. The first case mentioned by Mr. Spears was settled after the Court denied Dr. Talbot's motion for summary judgment. *See Lemond v. Talbot*, No. 2:17-cv-00113-JRS-DLP, dkt. 54, 67. There was no affirmative finding of deliberate indifference. The second case cited by Mr. Spears, *Wynn v. Southward*, 251 F.3d 588 (7th Cir. 2001), does not involve Wexford, Dr. Talbot, or PCF. Therefore, it is not relevant to Mr. Spears's claim that Wexford had a policy or practice of improperly diagnosing and treating prisoners at PCF.

Thus, Mr. Spears's claim against Wexford must fail as a matter of law and Wexford is entitled to summary judgment on the Eighth Amendment claim that Wexford had a policy or practice of improperly diagnosing and treating prisoner medical conditions.

## II. Plaintiff's Motion Requesting Oral Arguments

Having reviewed the pleadings submitted by the parties in support of and in opposition to the defendants' motion for summary judgment, the Court concludes that oral arguments are not warranted. The plaintiff's motion requesting oral arguments, dkt. [111], is **denied**.

### III. Conclusion

The plaintiff's motion request oral arguments, dkt. [111], is **denied**.

The motion for summary judgment filed by defendants Dr. Talbot, Nurse Practitioner Murage, and Wexford, dkt. [100], is **granted** as to all of Mr. Spears's claims.

This action is **dismissed with prejudice**. Final judgment consistent with this Order, the Order granting defendant Dr. Howe's motion for summary judgment, dkt. 96, and the screening Entry, dkt. 8, shall now issue.

**IT IS SO ORDERED.**

Date: 1/30/2020

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

ROBERT SPEARS
893470
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Jeffrey M. Kraft
SCHULTZ & POGUE LLP
jkraft@schultzpoguelaw.com

Peter H. Pogue
SCHULTZ & POGUE LLP
ppogue@schultzpoguelaw.com

Jarod Zimmerman
KATZ KORIN CUNNINGHAM, P.C.
jzimmerman@kkclegal.com